VIRGIL HAWKINS, Appellee, v. INTERURBAN RAILWAY COMPANY, Appellant.

RAILROADS: Liability Attending Operation—Private Crossings—
1  Warning Signals. Ordinary care may, in view of peculiar or extraordinary conditions, demand the giving of adequate and timely signals by bell or whistle of the approach of a railway train at a *private* crossing, even though not so required by statute. So, held as to a weed-obscured crossing.

RAILROADS: Liability Attending Operation—Approaching Private
2  Crossing—Contributory Negligence. Evidence in a quite close case reviewed, and held to present a jury question on the issue whether an injured party was guilty of contributory negligence in the manner in which he approached and went upon a private crossing which was alleged to have been weed-obscured.

TRIAL: Instructions—Correct, Yet Refused—Substantial Covering
3  of Subject. Refusing correct instructions in the form in which requested, yet substantially embodying the same thought in the charge to the court, presents no room for a claim of error.

**TRIAL:** Verdict—Excessiveness—$10,000—Reduction. Verdict for $10,000 for personal injury held to be excessive, and conditionally reduced to $5,000.

PRINCIPLE APPLIED: Plaintiff was 55 years of age, and was earning $92 per ·month as a mail carrier. He was hit by an interurban car. The fourth and fifth cervical vertebrae were to some extent forced out of line. Following the accident, he suffered constant and severe pain in his shoulders and neck; also loss of appetite and sleep; and stomach and bowel trouble also followed; he was unable to work for 60 days, and thereafter was not able to do as much work or as expeditiously as formerly. Much of his pain and stomach and bowel trouble appear to have been subsequently relieved; though at the time of the trial, he suffered considerable pain. At the time of the trial, a hump or deformity clearly appeared on his neck. The permanency of his injuries and the extent of his future pain were in doubt. *Held,* verdict of $10,000 was excessive, and ought to be reduced to $5,000.

*Appeal from Polk District Court.*—W. S. AYRES, Judge.

JUNE 24, 1918.

REHEARING DENIED SEPTEMBER 20, 1918.

THIS is an appeal from a judgment for $10,000 damages on account of injuries received by plaintiff in a collision with one of defendant's interurban cars.—*Affirmed on condition.*

*Parker, Parrish & Miller,* for appellant.

*John L. Gillespie,* for appellee.

PER CURIAM.—Plaintiff brings this action for damages on account of injuries which he claims to have received by colliding with one of defendant's cars, while he was attempting to cross the tracks of the defendant in-

1. RAILROADS: liability attending operation: private crossings: warning signals.

terurban railway company at a place known as the Alexander Crossing, a short distance west of Altoona. At the place where the accident occurred, and for a considerable distance east and west thereof, the tracks of defendant run

parallel to the River-to-River Road, a highway extending
across the state, upon which there is much travel.  The
highway lies south of the railroad right of way, and is sep-
arated from it by the right of way fence.  The crossing was
constructed of planks, in the usual manner, except, it is
claimed by plaintiff, that one of the planks north of the
north rail, becoming rotten, had been partially removed,
leaving the top of the rail about four inches higher than
the ground.  Cattle guards, constructed in the usual man-
ner, were placed at each side of the crossing, and were
66 feet apart.  Wing fences were erected from the cattle
guards to the right of way fence on each side of the right
of way.  These fences were constructed of six-inch boards,
nailed to the posts so as to leave about six inches between
them.  The crossing was open at its intersection with the
highway, but a gate was maintained at the north right
of way fence, through which the Alexander premises were
entered.

The accident occurred on the afternoon of July 13,
1913.  Plaintiff was driving a small two-cylinder Maxwell
car, going west on the River-to-River Road, and the car
with which he collided was an extra, proceeding eastward
to Mitchellville.  The interurban cars, when operated over
this line on schedule time, were run one hour and ten min-
utes apart.  The regular eastbound car had passed plain-·
tiff on the highway somewhat less than two miles east of
the crossing.  The track of defendant's railway, west of the
crossing, passes through a cut from 2½ to 4 feet in depth.
The surface of the ground, however, is about level, from the
crossing west for a distance of 125 feet, after which there
is a decline to the west.  Plaintiff was a man of small stat-
ure, being but 5 feet and 5 inches in height.  The sun was
shining brightly at the time of the accident, and a slight
wind was blowing from the south.  Charles Urfer, W. H.
Keister, who sat in the front seat, and another man who

sat in the rear seat of an automobile, were following plaintiff in the highway a short distance behind, but arrived at the crossing in time to see the accident. A farmer by the name of Hammer, residing near, whose attention was attracted by the ringing of the gong on the interurban car, saw the collision. The other eyewitnesses were the conductor and motorman.

Plaintiff testified that he was traveling west· in the main traveled portion of the highway, and that the point where he turned therefrom toward the crossing was from 50 to 60 feet southeast therefrom; that he then looked west, and again when about 16 feet from the defendant's track, and did not see the defendant's car approaching; that he saw the car when the front wheels of his automobile were about on the crossing; that he attempted to reverse his car, but, believing he would be unable to avoid a collision, went forward, and the car collided with the rear of his automobile, throwing him a considerable distance against the right of way fence, severely injuring him. No warning of the approach of the interurban car was sounded until plaintiff was near the tracks.

There is some conflict in the testimony as to the exact location of plaintiff's automobile, and also of the interurban car, when the warning was given. Keister testified that defendant's car was, perhaps, 200 feet west of the crossing, and plaintiff's automobile within 10 or 12 feet south of the track, when he heard two sharp blasts of the whistle. Urfer, the other occupant of the car, who was called as a witness, testified that the interurban car was not over 25, 50, or, maybe, 75 feet from the crossing when he first saw it, and that Hawkins was just about approaching the track, when he heard the whistle. Hammer testified that he saw the automobile when it was turning from the highway north into the Alexander road, and that the interurban car was pretty close to the crossing when the auto-

mobile turned; that it was a little further from the cross-
ing than the automobile. Defendant's conductor testified
that his car was 150 to 200 feèt from the crossing when the
whistle blew, while the motorman stated that it was not over
100 feet from the crossing, and maybe not that far, when he
first sounded the whistle. From the evidence, we gather
that plaintiff was traveling at the rate of 10 or 12 miles
per hour in the highway, and reduced his speed somewhat
after he turned into the Alexander road. The speed of the
interurban car is not shown, except as the distance it trav-
eled after the emergency brake was set might throw light
thereon.

The reason assigned by plaintiff for not seeing the
interurban car was that his view was obstructed by the
wing fence and tall weeds and grass in close proximity
thereto, and along defendant's right of way fence for a con-
siderable distance west. He also claimed that the defective
condition of the crossing above stated made it necessary for
him to exercise care in passing over the same with his auto-
mobile, and that his attention was, therefore, attracted
toward the crossing. There is some evidence that the road
was a few inches lower at the crossing than on either side
thereof.

Keister further testified that he made observations from
the car in which he was riding, and that he plainly saw the
interurban car approaching the crossing, for a considerable
distance before the whistle was sounded. Later, observa-
tions were made, on behalf of defendant, of the crossing,
and photographs and measurements were introduced in evi-
dence for the purpose of showing that the car with which
plaintiff collided could have been seen from the point where
he turned from the highway toward the crossing for a dis-
tance of 463 feet, and from a point 28 feet from the cross-
ing a distance of 433 feet, and from a point 10 feet south
of the crossing for a distance of 759 feet.

The height of defendant's car is 13 feet from the rail to the top of the car, and the height of the trolley pole, in running position, 19½ or 20 feet.  Alexander, for whose use the crossing was constructed, testified that he had made observations from his automobile and also from a buggy, at or near the points indicated by plaintiff, and that he could see a car approaching at a distance of from 40 to 45 rods. The evidence does not disclose when these observations were made.  There appears to have been no material change in the condition of the crossing or of the fence and vegetation in the vicinity, after the accident and before the observations were made by defendant's witnesses and the photographs taken.  Further necessary facts will be stated in the course of the opinion.

I.   The grounds of negligence submitted by the court were stated in its instructions as follows:

"That the defendant corporation was negligent in that it failed to give proper or adequate signal or warning of the approach of said interurban car from the west at a reasonable and proper distance from said Alexander crossing, and failed to exercise ordinary care and diligence to warn the plaintiff of the approach of said interurban car."

Appellant contends that the evidence wholly failed to establish negligence upon its part, and that it appears therefrom that plaintiff was clearly guilty of contributory negligence.  It is conceded that the gong was not sounded, nor whistle blown, until the motorman discovered plaintiff closely approaching the crossing.  As appears from the foregoing statement, the automobile must have been very close to the crossing, and the interurban car not to exceed 200 feet therefrom, and the jury may have found from the evidence of the motorman that it was less than 100 feet from the crossing when the warning was given.

The statute requiring the defendant to ring a bell or blow a whistle, upon approaching a highway crossing, is

not applicable to private crossings. The duty of the railway company in approaching a private crossing is to exercise reasonable care to avoid injury to persons using the same; "and if, by reason of peculiar or extraordinary circumstances surrounding a crossing, and known to the trainmen, ordinary prudence would require an alarm or signal to be given by an approaching train, then its omission would be negligence; but in the absence of such circumstances no such duty arises." *Nichols v. Chicago, M. & St. P. R. Co.*, 125 Iowa 236; *Hartman v. Chicago G. W. R. Co.*, 132 Iowa 582; *Weaver v. Chicago & N. W. R. Co.*, 146 Iowa 149; *Ressler v. Wabash R. Co.*, 152 Iowa 449; *Grafton v. Delano*, 175 Iowa 483; *Wiese v. Chicago G. W. R. Co.*, 182 Iowa 508.

The conductor testified that he saw plaintiff when he was from 50 to 75 feet east of the crossing, and that he saw him turn the corner and drive toward the crossing; that plaintiff was in plain view all of the time after he first saw him; and that plaintiff did not look toward the interurban car after witness saw him. The motorman testified that, when he first saw plaintiff, his car was 200 or 300 feet west of the crossing, and that, after he saw plaintiff turn in, he sounded the whistle and applied the air brake. He gave it as his judgment that the interurban car traveled about 150 feet after he applied the air brake. The car was stopped about 75 to 100 feet east of the crossing.

Counsel for appellant argue that, as travel upon the River-to-River Road is very extensive, and the crossing in question but comparatively little used, no duty rested upon the servants in charge of its car to sound a signal or give warning, until plaintiff turned to go over the crossing; that they could not presume that he would leave the highway and go upon the crossing. There is evidence that thick, tall weeds and grass had grown up along the wing and right

of way fences, and that the same tended to obstruct the vision of a traveler in a low position upon the crossing, and prevent him from seeing an approaching car.  The condition of the crossing in this respect was, of course, known to appellant's servants.

While there is much conflict in the evidence as to the effect of the grass and other obstructions complained of, yet the question whether the safety of persons using a crossing so situated required the sounding of the whistle or ringing of the bell, or some other warning of the approach of the car, was for the jury.

"If ordinary prudence exacted that such precaution be taken for the safety of persons approaching this private crossing, it must have been taken by defendant, even though not exacted by statute."  *Wiese v. Chicago G. W. R. Co.,* supra.

The condition of the crossing, the presence of tall grass and weeds along the fences, and the claim of the conductor and motorman that they saw plaintiff approaching the crossing in his automobile in the manner shown, may well have justified the jury in finding that warning, in time to prevent the collision, should have been given.

II. The claimed· contributory negligence of plaintiff presents a much more difficult question.  Plaintiff was a rural mail carrier, and had been engaged in that business for several years, and claimed that he knew

2. RAILROADS: liability attending operation: approaching private crossing: contributory negligence.

and appreciated the danger of railway crossings, and was always careful to look and ascertain whether a train was approaching, before attempting to pass over the crossing; and that, in this instance, he looked at least twice before he reached the zone of danger, but neither saw nor heard the approach of a car.  The conductor directly contradicted the statement of plaintiff that he looked in the direction of the approaching car.  It is claimed that the pictures

offered in evidence were taken with the camera set near the spot where plaintiff located himself at the time he looked to see whether a car was coming, and at the distance from the ground that plaintiff testified his eyes were at the time. These pictures show considerable grass and tall weeds in the vicinity of the wing and right of way fences, and each reveals a car standing upon the track in the distance. Defendant's witnesses also testified that the car shown in the pictures was located at the distance from the camera above stated. If the view presented by the pictures correctly shows the situation as it would have appeared to plaintiff, had he looked west at the points indicated, there is no doubt that he could and should have seen the approaching car. However, whether the location and position of the camera were such as to faithfully reproduce the surroundings as they appeared to plaintiff, were questions of fact. There was a fence and tall grass and weeds in the vicinity thereof, which, plaintiff testified, obstructed his view. Urfer also testified that some of the weeds were nearly as high as the fence, and continued over the right of way. The camera, when one of the pictures was taken, stood 10 feet south of the crossing. From this position, the picture indicates that a car could have been seen at all points for a distance of 759 feet. According to the testimony of plaintiff, the distance from the front end of the automobile to where he sat was 10 feet and 3 inches.

The jury may have found that warning was given about the time the front end of plaintiff's car reached the south rail, and when the interurban car was within 75 feet of the crossing, and that the claim of the conductor and motorman that they could, and did, see plaintiff from the time he started to turn north into the Alexander road, was improbable from the fact that if, as the conductor testified, plaintiff did not look in the direction of the approaching car, the motorman would have given warning before plain-

tiff reached a place of certain peril.  The fact that warning may not have been given until plaintiff's car reached the point where all the evidence shows defendant's car was visible, tends, in some measure at least, to sustain plaintiff's claim that his view was obstructed by the fence and weeds, and that he did not see the car until he had reached the place substantially as claimed by him.  Plaintiff also claimed that he knew of the drop on the north side of the north rail of defendant's track, and that it was necessary that he give careful attention to the movement of his car at this point.  This tended to divert his attention from the direction of the approaching car.  The duty of a person approaching a railway crossing to be vigilant to discover the approach of trains and to use reasonable care and caution to avoid injury therefrom is well established in this state.  *Schulte v. Chicago, M. & St. P. R. Co.*, 114 Iowa 89; *Hartman v. Chicago G. W. R. Co.*, supra; *Meyer v. Chicago, R. I. & P. R. Co.*, 134 Iowa 722; *Gray v. Chicago, R. I. & P. R. Co.*, 143 Iowa 268; *Lockridge v. Minneapolis & St. L. R. Co.*, 161 Iowa 74; *Dusold v. Chicago G. W. R. Co.*, 162 Iowa 441; *Hough v. Illinois Cent. R. Co.*, 169 Iowa 224; *Wiese v. Chicago G. W. R. Co.*, supra.

In *Schulte v. Chicago, M. & St. P. R. Co.*, supra, the court said:

"The traveler is held to the duty of looking and listening for approaching trains within a reasonable distance from the crossing, and, if this has been done, it is for the jury to say whether he was bound, in the exercise of ordinary care, to stop and look and listen, or to look and listen without stopping, at some other point nearer or farther therefrom."

In *Hartman v. Chicago G. W. R. Co.*, supra, the court said:

"It is easy to say, and it is a correct proposition, that a person approaching a railway crossing must bear in mind

that it is a place of danger, and be vigilant to discover the approach of trains, and use reasonable care to avoid injury therefrom; but whether such reasonable care requires him to stop, look, and listen, or whether, having done so, he must stop, look, and listen again, whether he may place any reliance on the absence of danger signals, or upon any other given fact or circumstance, depend so much upon the peculiar conditions by which he is surrounded, that, save in cases exceptionally free from doubt, the question must be left to the answer of the jury."

Many cases are cited from this and other jurisdictions by counsel for appellant in their brief in which it was held that plaintiff was guilty of contributory negligence in failing to properly observe his duty in approaching a railway crossing; but in many of the cases cited, the negligence of the plaintiff was apparent, and in others, the facts distinguish the cases from the case at bar. It will serve no useful purpose to extend this opinion by reviewing the cases in which contributory negligence of the plaintiff was held to have existed as a matter of law. While the crossing in question was private, it was open from the highway to the north, and furnished the only means of ingress and egress to and from the premises of Alexander from the highway. Its use may not have been extensive, but it must have been known to the servants of defendant that travelers were, nevertheless, likely at any time to be thereon. There was such conflict in the evidence upon the question of plaintiff's negligence that reasonable minds, searching for the truth, might differ as to the correct conclusion to be drawn therefrom; and we are, therefore, constrained to hold that the district court did not commit error in submitting the case to the jury.

III. Appellant requested the court to give 32 instructions, all of which were refused. The ruling of the court upon each of said instructions is complained of. Not all

**3. TRIAL: in-structions: correct, yet re-fused: sub-stantial cov-ering of subject.**

of them, however, are considered in argument. Counsel also excepted to the eighth and ninth instructions given by the court. We will dispose of the alleged errors in the refusal to give the instructions offered, and in the instructions given, together.

The court, in its eighth instruction, advised the jury that:

"The rights of plaintiff and defendant, at the railroad crossing in question, were equal, subject to the precedence which the heavy and rapidly moving interurban cars may require when both parties approach the crossing at the same time."

The appellant requested the court, in substance, to instruct the jury that defendant had the right of way over the crossing, and that it was the duty of plaintiff to so approach the same as to yield such right to the defendant, and to have his automobile under control and moving at such a reasonable rate of speed as that he could stop his car and avoid accident. The instruction given is in line with our holding in *Ressler v. Wabash R. Co.*, supra, and evidently based thereon. Other requested instructions related to the care and diligence required of plaintiff in approaching a private crossing; but the court, in its ninth and other instructions, fully and accurately stated the law, and submitted to the jury the question of plaintiff's duty. The thought of the requested instruction is fully embodied in the court's charge; likewise, we are of the opinion that others of the requested instructions, defining the duty of plaintiff to look and listen upon approaching the crossing, to have his automobile under control, and defining contributory negligence, were sufficiently covered by the instructions given. To consider each of the alleged errors in the refusal of the court to give the offered instructions, would unduly extend this opinion. Suffice it to say that we

find no error in the rulings of the court, and that the case, which seems to have been tried with unusual care by court and counsel, was fairly submitted to the jury.

IV. Plaintiff was 55 years old at the time of the accident, and was earning $91.66 per month. In carrying mail, he used his automobile. He testified that, immediately after the accident, he suffered constant severe pain from the top of the shoulder blades to the base of his skull and down his back, also loss of appetite, and was, to some extent, unable to sleep, took medicine for his stomach and bowels, and was unable to work for about 60 days. The record does not disclose what expense of medical treatment and nursing he incurred. He was attended, at first, by a physician, and later was treated by a chiropractor, who appears to have relieved him from pain and from the stomach and bowel troubles complained of, and restored his respiration, with which his injuries to some extent interfered. He claims, however, that he still suffers pain and considerable inconvenience, at one place in the back of his neck. Before the accident, he claims to have been a strong, healthy man, able to perform his duties with ease and comfort, and that he played the violin; but since his injuries, he has been unable to carry on his work as rapidly and easily as before; and that he suffers pain and inconvenience in his neck practically all of the time, and cannot play the violin; that he finds it necessary to support his head with a pillow, or something of that nature, when in a sitting position. The physicians who first attended him were not called as witnesses. Dr. Burcham testified that he took X-ray pictures of his neck, and it appears therefrom that the fourth and fifth cervical vertebrae are, to some extent, out of line. One of the doctors referred to this place as a hump, or small prominence, in the middle of the back of his neck. Dr. Ely testified that, when he first examined

4. TRIAL: verdict: excessiveness: $10,000: reduction.

plaintiff, he held his neck rigid, and one of the big muscles down the right side thereof appeared to be tense; but, at that time, there was no appreciable deformity of the neck. At the time of the trial, however, the hump or deformity was clearly noticeable. Dr. Taylor, an osteopathic doctor, expressed a somewhat guarded opinion that the injury might continue for a considerable time to cause plaintiff pain, but the extent thereof he was unable to state. Dr. Ely expressed considerable doubt as to whether the plaintiff's injuries were permanent. After resuming work, plaintiff lost little time.

Counsel for appellant stoutly maintain that the verdict is grossly excessive, while, on the other hand, counsel for appellee insists that plaintiff's injuries are of a very serious, permanent nature, and that the greater opportunity of the court and jury to observe his appearance and condition are matters that should be given great weight by this court in determining whether there should be a reversal on account of the allowance of excessive damages by the jury. Witnesses who have long known plaintiff, including the postmaster from whose office he works, testified that he was not able to perform as much labor, or as expeditiously, as before the injury, and that he appeared to suffer pain in his neck.

There would seem to be no doubt that one or more vertebrae in plaintiff's neck were injured, but whether the same is permanent, the evidence leaves in doubt. While the nature and extent of his injuries were questions of fact, to be submitted to the jury, we cannot approve the verdict in this case. It is true, there is no fixed rule for determining the amount of damages to be awarded in cases of this character. It is obvious that the amount found by the jury greatly exceeds the damages shown. The extent to which his earning capacity may have been impaired in other lines of work, does not, of course, appear, as he has been

employed only as a mail carrier since the accident. He has been able to perform his duties in this respect without loss of time. He complains, however, of some discomfort from the jarring of his car, as above stated. In our opinion, the judgment of $10,000 should be reduced to $5,000.

Upon condition, therefore, that plaintiff file his written consent in this court that the judgment may be reduced to $5,000, the same will be affirmed; but unless such consent is filed, the judgment will stand reversed. The costs of this appeal, in the event plaintiff files an election to accept the judgment as reduced, will be taxed to appellant; otherwise, to appellee.—*Affirmed on condition.*

PRESTON, C. J., LADD, EVANS, GAYNOR, and STEVENS, JJ., concur.