Ernest C. PAULSEN, Appellant,

v.

DES MOINES UNION RAILWAY COMPANY, Appellee.

No. 59670.

Supreme Court of Iowa.

Feb. 22, 1978.

Larry D. Krpan and Ronald A. Baybayan, of Mike Wilson Law Firm, Des Moines, for appellant.

L. R. Voights and Keith E. Luchtel, of Nyemaster, Goode, McLaughlin, Emery & O'Brien, Des Moines, for appellee.

McCORMICK, Justice.

This appeal involves the question whether defendant Des Moines Union Railway Company proved its defense of contributory negligence as a matter of law in bar of plaintiff Ernest C. Paulsen's action for damages arising from a crossing accident. Paulsen obtained a jury verdict under instructions submitting that issue to the jury. Upon the railroad's motion for judgment

notwithstanding the verdict, the trial court entered judgment for the railroad on the basis Paulsen's injuries were, as a matter of law, proximately caused by his failure to maintain a proper lookout on the occasion involved. The court also conditionally sustained the railroad's alternative motion for new trial on several grounds. We reverse the judgment but affirm the order for new trial.

I. *The judgment notwithstanding the verdict.* When considering a motion for judgment notwithstanding a verdict, the trial court is required to view the evidence in its light most favorable to the verdict regardless of whether it is contradicted. Every reasonable inference from the evidence must be carried to the aid of the verdict. *Winter v. Honeggers' & Co., Inc.,* 215 N.W.2d 316, 321 (Iowa 1974). In determining whether the trial court erred in sustaining the motion, we examine the evidence in the same manner. *Champlin v. Walker,* 249 N.W.2d 839, 840 (Iowa 1977). It will be recited in that light here.

Paulsen was employed by University Sand and Gravel Company as a dump truck driver. His truck was a 1968 tandem Chevrolet dump truck about 22 feet in length with a box 15 feet long and 8 feet wide. The cab was approximately five feet wide. Shortly before noon on June 1, 1972, he was directed to deliver a load of sand to premises of Forrest and Associates. Those premises were located beneath the Ninth Street viaduct in Des Moines in a congested industrial area.

Paulsen had been to the Forrest premises on two or three prior occasions. An industrial spur track of the railroad intersected the lot in a north-south direction, curving southwesterly from a private crossing. Paulsen arrived at the lot shortly after noon. He drove south onto the lot from a north-south road which was west of the tracks. He stopped and left his truck long enough to enter the office and find out where he was to dump the sand. He was told to deliver it to a site on the southeast corner of the lot. He returned to his truck, backed up and turned toward the east to traverse the private crossing. He looked both ways for trains and, seeing none, proceeded over it.

When he reached the southeast corner of the lot Paulsen was shown where to dump the sand. He maneuvered his truck so it was facing north and dumped the load. He pulled the truck forward to clean the box. At that point he was approximately 100 feet due east of the crossing. He signed a weight ticket and then began turning northwesterly to exit. The truck had a wide turning circle. In addition, a forklift truck was operating on the lot. Various materials, including pallets, were piled there. A photograph taken the next day shows telephone poles stacked in an east-west direction on the lot, although at trial Paulsen could not remember whether they were there on the date of the accident. Gas pumps were located south of a building on the north end of the lot, and it was necessary for Paulsen to pass south of them.

As he turned the truck, maneuvering to avoid the obstructions and activity on the lot, he arrived at a point about two and one-half truck lengths north of the crossing and somewhat more than 15 feet east of the railroad tracks, heading in a southerly direction parallel to the tracks. He stopped there, talked briefly to a Forrest employee, called his dispatcher, and then began to drive toward the crossing. A post about 15 feet east of the tracks prevented him from turning west until he was fairly close to the crossing.

The weather was mild and it was a clear day. The truck windows were open. Its engine was operating at a normal noise level. Paulsen testified as follows about what happened as he drove toward the crossing:

> I just looked out my mirrors and looked. All I could see was this part like that, that building. As I turned the truck more my vision became less. I come on down here. I come on to the track. I didn't see a thing. My vision was parallel this way. My truck was sitting this way. I looked out my rear view mirror on the right hand side. I had it set to see where

the wheels of my truck would be. I could see about three or four feet beyond the wheels on the street side, that's all I can see back there. The reason for that is there is so many little cars and little kids running around you have to see whether they are behind you.

He described his field of vision when he first started toward the tracks.

I didn't see no rail at this point. All I could see was this right rail on the far west as I come up here. This approach comes up this way, and my right hand corner of the truck comes up a couple inches. Then the rail—I am sitting back tipped this way, and the rail got away from me.

He said he was able to see well to the front and to the sides except as the passenger-side door interfered. Then he testified further:

When I looked out the right side, all I could see was this left rail and only about that—just barely see it, the left rail. Q. The left rail? A. Yes, which would be on the right * * *.

As he proceeded toward the crossing and began his turn his field of vision changed:

As I proceeded toward the crossing my field of vision become less and less all the time looking out my mirror and to the right. I come close to the track and the right hand part of my truck as I kept getting closer, it got away, like you turn a corner with your car, as your car gets up there you don't see the curb no more. Later on you see it, you don't see it as you turn into it. I didn't see it at all.

He said he was traveling two to four miles an hour and was looking to see if anyone was coming over the crossing because equipment and trucks were in the area. He listened but heard nothing other than the sound of his own vehicle.

He approached the crossing at somewhat of an angle because he was still turning as he reached the tracks. At the crossing he could see to the north through his passenger-side window, but he did not see the engine before it struck his truck. Paulsen testified:

I didn't hear anything. I continued to look, and I didn't see it. In fact, I looked and didn't see it. All of a sudden, there it was. He was coming a pretty good clip evidently, that is why I didn't see him.

The impact was on the cab just forward of the right front corner of the box. It turned the truck and knocked it off the track 30 or 40 feet from the point of collision.

The railroad had been using an engine to switch boxcars on the track. Just prior to the accident the switch engine was heading south on the track. The engineer was seated on the right or west side of the engine. His vision to the east and front was limited. He could not see anything in those directions within the last 50 feet before reaching the crossing. He did not see Paulsen's truck prior to colliding with it and did not know he had hit it until immediately after the accident when he heard someone shouting.

A Forrest employee estimated the engine speed at 25 miles per hour. Neither he nor Paulsen heard a bell or whistle. When the employee first saw the engine it was approximately 100 feet north of the crossing and Paulsen's truck was approximately five feet from the east rail. The engine traveled about 50 feet after striking the truck.

In seeking to uphold the judgment the railroad relies on Iowa cases decided under a different contributory negligence standard than exists now. When those cases were decided the burden was on the plaintiff to prove as an element of his cause of action that he was not guilty of any negligence which contributed in any manner or to any degree to his injury or damages. In 1965 the Legislature changed the law, placing the burden on the defendant to plead and prove that the plaintiff was negligent and that such negligence was a proximate cause of the injury or damages. Acts 61 G.A. ch. 430, § 1; § 619.17, The Code.

Two aspects of this change make it more difficult than before to justify a finding as a matter of law that a plaintiff is barred from recovery because of contributory negligence. First, the defendant instead of the

plaintiff bears the burden of producing evidence and the burden of proof on the issue. Second, the requirement that the plaintiff's negligence be shown to be a proximate cause of the injury or damages imposes a heavier burden than existed under the former rule. *McDowell v. Chicago, Milwaukee, St. Paul & Pacific R. Co.,* 507 F.2d 5, 8 (8 Cir. 1974). Consequently, cases decided under the old rule have less value as precedent. Proving the contributory negligence defense as a matter of law is a formidable task.

Ordinarily the questions of negligence and proximate cause are for the trier of fact. Only in exceptional cases does a party having the burden of proof on an issue establish it as a matter of law. Even when facts are not in dispute or contradicted, a jury question is engendered if reasonable minds might draw different inferences from them.

■ Contributory negligence is not to be found as a matter of law unless it is so palpable, flagrant and manifest that no other conclusion is reasonable. *Ackerman v. James,* 200 N.W.2d 818, 824–825 (Iowa 1972).

■ It is similarly difficult to establish proximate cause as a matter of law. *Osterfoss v. Illinois Central Railroad,* 215 N.W.2d 233, 238 (Iowa 1974). In order to do so, the defendant must prove, as a matter of law, not simply that the accident would not have occurred but for the plaintiff's negligence but that the plaintiff's conduct was a substantial factor in bringing about the harm. *Pedersen v. Kuhr,* 201 N.W.2d 711, 713 (Iowa 1972).

Even under the former contributory negligence standard, the question was usually for the jury when the traveler's view of the railroad tracks was obstructed or there were diverting circumstances. The duty to maintain a proper lookout was explained as follows:

A traveler approaching a railroad must look when by looking he can see. A traveler is required to look for approaching trains within a reasonable distance

from the crossing, but not at any particular place nor at all points. It is ordinarily for the jury to determine whether he selected a proper place for making observation and otherwise used ordinary care for his safety. When the jury could find that a traveler looked within a reasonable distance from the crossing, a court will not ordinarily say, as a matter of law, he was guilty of contributory negligence because he did not look again from some other designated point from which he might possibly or probably have discovered the train. That some other course might have been better or safer or have avoided the collision does not establish, as a matter of law, contributory negligence. A plaintiff is not to be judged by what might now appear to have been the safer course. The law does not require perfect care, but only ordinary care under the attendant circumstances. Nor does the law specify precisely what must be done in exercise of such care. *Coonley v. Lowden,* 234 Iowa 731, 736–737, 12 N.W.2d 870, 874–875 (1944).

In *Coonley* the court also pointed out that this duty is affected by the traveler's right to assume the railroad's compliance with the law. For purposes of the present appeal the railroad's negligence has been established.

■ The railroad contends, however, that Paulsen should not have the benefit of the "obstruction rule" because the obstruction to his vision was his own truck and hence was of his own making. Assuming the obstruction rule is subject to this limitation, the problem with the contention here is that the jury could find the maneuvering which put Paulsen's truck in the position which limited his vision was caused at least partly by circumstances which were not of his own creation. The turning circle of the truck, obstacles on the lot, and equipment operations there were factors beyond Paulsen's control which led to his choice of route. It was for the jury to say whether he was negligent in these circumstances.

Except for the effect of the fact his vision was hampered by his own vehicle, the

evidence viewed in its light most favorable to Paulsen would permit the jury to find he looked and listened as he should have. Because the fact his vision was impeded would not necessarily have been caused by lack of due care, we do not believe the trial court was compelled to find the accident was proximately caused by his failure to maintain a proper lookout. It is easy to say now, aided by hindsight, that he should have maneuvered his truck differently so that he could have approached the crossing perpendicularly. A jury might well find due care required him to do so. However, for a court to say this as a matter of law is to do what *Coonley* prohibits. It judges the plaintiff's conduct by what now appears to have been a safer course, requires perfect care rather than ordinary care, and specifies precisely what must be done in the exercise of due care.

Paulsen was not free in the circumstances to focus his entire attention on the risk a train might approach the crossing from the north. He was obliged to spread his concern to risks of other kinds in other directions from other causes.

■ The duty to maintain a proper lookout implies being watchful of the movements of the driver's vehicle in relation to other things seen and which could be discerned or seen in the exercise of ordinary care. It requires the care, watchfulness and attention of the ordinarily prudent person in the circumstances. *Bradt v. Grell Construction, Inc.*, 161 N.W.2d 336, 341 (Iowa 1968). Limited visibility increases the risks confronting a vehicle operator. Due care requires precautions commensurate with increased risk. However, we cannot say all reasonable minds would be compelled under the circumstances here to find the contributory negligence defense was established.

Therefore the trial court erred in sustaining the railroad's motion for judgment notwithstanding the verdict.

■ II. *New trial.* Pursuant to rule 248, Rules of Civil Procedure, the trial court conditionally granted the railroad's alternative motion for new trial. One of the grounds on which the motion was sustained was the failure of the jury to deliberate for not less than six hours as required by rule 203(a), R.C.P., before returning a verdict rendered on a five-sixths vote.

The case was submitted to the jury at 11:50 a. m. The jury recessed for lunch for approximately one hour and, after resuming deliberations, returned its five-sixths verdict at 6:15 p. m. Thus the jury failed to deliberate for not less than six hours before rendering its five-sixths verdict as required by rule 203(a). This case is controlled by our decision in *Parker v. Tuttle*, 260 N.W.2d 843 (Iowa 1977).

The trial court was correct in sustaining the railroad's motion for new trial on this ground.

The court also sustained the motion on grounds relating to submission of specifications of negligence against the railroad and sufficiency of the court's instructions on those issues. It is questionable whether the railroad preserved error on these grounds. We will address them only to the extent necessary to provide guidance upon retrial.

■ The duty of a railroad at a private crossing "is to exercise reasonable care to avoid injury to persons using the same; 'and if, by reason of peculiar or extraordinary circumstances surrounding a crossing, and known to the trainmen, ordinary prudence would require an alarm or signal to be given by an approaching train, then its omission would be negligence; but in the absence of such circumstances no such duty arises.'" *Hawkins v. Interurban Railway Company*, 184 Iowa 232, 238, 168 N.W. 234, 235–236 (1918). See *Graves v. Chicago, Rock Island & Pacific Railway Company*, 207 Iowa 30, 222 N.W. 344 (1928).

The railroad acknowledges, for purposes of the appeal, that the evidence was sufficient to submit specifications based on failure to maintain a proper lookout and failure to sound a bell. It contends the evidence was insufficient to support specifications based on failure to sound a whistle, failure to warn and excessive speed.

The contention relating to sounding the whistle rests on a Des Moines ordinance proscribing blowing the whistle "except in cases of immediate danger." An immediate danger exists when a collision is threatened. Under the evidence a jury question existed regarding this specification. Upon retrial the specification should be submitted if the evidence is again sufficient for the jury to find the exception applies.

The specification of failure to warn has no basis under the record apart from the alleged failures to sound bell or whistle and need not be separately submitted.

Under principles explained in *Hawkins v. Interurban Railway Company,* supra, we believe the evidence was sufficient to submit the specification of excessive speed.

We reverse the judgment for defendant but affirm the granting of a new trial.

REVERSED IN PART; AFFIRMED IN PART.

All Justices concur except HARRIS and UNLENHOPP, JJ., who dissent.

HARRIS, Justice (dissenting).

The majority accurately states the facts and governing principles but I believe it reaches the wrong conclusion. I am convinced plaintiff was contributorily negligent as a matter of law.

By whatever route he chose or felt compelled to follow as he approached the crossing, plaintiff's final approach was at an angle. He was aware of the crossing and knew *his own* truck box, because of the angle, obstructed his view toward the approaching train. In spite of the obstruction of his truck box plaintiff drove onto the crossing and the accident resulted. I am convinced this was negligence as a matter of law.

I am also convinced plaintiff's negligence as a matter of law contributed to the accident in question. Clearly the accident would not have occurred but for plaintiff's negligence. In addition one must conclude plaintiff's conduct was a substantial factor in bringing about the harm. Hence plaintiff's negligence contributed to the accident. *Pedersen v. Kuhr,* 201 N.W.2d 711, 713 (Iowa 1972); Restatement (Second) of Torts, §§ 431 and 433.

I freely subscribe to the expression in the majority opinion which describes the two difficulties faced by anyone seeking a finding of contributory negligence as a matter of law. Such a finding should not avail as a basis for substitution by a trial or appellate court of its factual findings for those of a jury. Too often cases in former times revealed just such a misapplication of the doctrine. I am glad to join in renouncing such misapplications. Yet if the doctrine of contributory negligence as a matter of law remains in any way viable I believe the facts in the instant case demand its application. If the doctrine is no longer alive the majority should say so and lay it to rest.

I would affirm.

UHLENHOPP, J., joins this dissent.