Ernest L. WINTER, Appellee,

v.

HONEGGERS' & CO., INC., Appellant.

No. 55762.

Supreme Court of Iowa.

Feb. 20, 1974.

Watson, Elgin & Hoyman, Indianola, for appellant.

Reynoldson, Brown & Van Werden, Osceola, for appellee.

Heard before, MOORE, C. J., and MASON, RAWLINGS, LeGRAND and UHLENHOPP, JJ.

MASON, Justice.

Defendant appeals from judgment entered on a plaintiff's verdict awarding damages in a law action tried on the theory defendant's breach of either express or implied warranty was a proximate cause of plaintiff's hogs developing a certain illness or disease resulting in damage to plaintiff.

Ernest L. Winter, a Clarke County farmer engaged primarily in the production and sale of hogs for breeding stock, purchased from defendant Honeggers' & Co., Inc., a confinement hog farrowing house known as a "Thrive Center" designed and manufactured by defendant with a 24-sow capacity. Defendant erected the facility on plaintiff's farm in time for its use in July 1967.

Plaintiff had started in a disease control program on breeding stock known as SPF in 1965 by purchasing some gilts and a boar from accredited herds. The initials stand for "Specific Pathogen Free." It is a group that has been founded to administer a program for the control of the two chronic respiratory diseases of swine, atrophic rhinitis and the chronic mycoplasmal pneumonia formerly called virus pneumonia.

From the record we learn that atrophic rhinitis is a transmissible wasting of the delicate turbinate of the nasal cavity. The actual tissue changes are primarily a stunting and a resorption of this delicate, scroll-like bone and a failure of the development to a limited extent of the denser bones that make up the nasal cavity.

Another witness tells us that atrophic rhinitis is a disease of the hog; the nose is infected with organisms and as a result of that infection, there may be damage to the internal bones called turbinates, and the lining of those bones to a varying degree will erode away or be reabsorbed and thereby cause problems in filtering out the air as it passes through the nose into the lungs. Rhinitis is normally associated with a decrease in rate of gain in the efficiency with which market hogs being fed for slaughter will convert feed into gain. They are usually more susceptible to secondary respiratory infections. It is caused only by a disease organism known as bordetella. There is a difference of opinion among experts here as to whether there is a distinction between infectious atrophic rhinitis and atrophic rhinitis.

We understand that to become an accredited SPF hog herd, the swine must go either through the laboratory at Manilla, Iowa, (which procedure is not relevant here) or be purchased as SPF accredited stock. The swine must be tested for Brucellosis and a veterinarian must make a quarterly report in regard to health and disease. He makes visual inspection to determine the problems, if any, the farmer is having with his herd, what type of precautions he takes on his farm and what visitor control he might have. This report is sent to the national office in Conrad, Iowa.

It is further required that after the herd is started and sows farrow and the litter is brought along, 10 head of butcher hogs must be taken to slaughter for visual inspection before any can be sold. If they pass visually, they are then accredited.

Plaintiff received his accreditation in this program August 26, 1965, after going through the regular accrediting procedure. After going into the program Winter purchased only hogs that were SPF accredited. He had a "closed herd" and had no health problems with his SPF herd prior to construction of the Honeggers' Thrive Center hog house.

Following the August 26, 1965, slaughter check plaintiff was checked again February 23, 1966, and passed. He was rechecked and passed August 10, 1966, January 26, 1967, and again August 2, 1967. There were 10 hogs slaughter checked each date at a Des Moines slaughter house by Dr. Spear who made most of the visual inspections. None of these swine were farrowed in the Honeggers' Thrive Center farrowing house.

Plaintiff first experienced difficulty January 25, 1968, after his swine went for slaughter check and failed because of damage to the turbinates. This was visually diagnosed by Dr. Spear as atrophic rhinitis and caused Winter to lose his SPF accreditation for approximately four months. He also received "bad checks" in November 1968 and May 1969.

January 25, 1968, plaintiff's accreditation was suspended. After reinstatement his accreditation was again suspended November 13, 1968, when Dr. Spear diagnosed atrophic rhinitis in some of the carcasses. After again being reinstated plaintiff's accreditation was fully revoked in May 1969 as a direct result of the diagnosis atrophic rhinitis by Dr. Spear in certain carcasses of animals slaughtered from plaintiff's herd. The hogs involved in the slaughter checks in January, November and May had been farrowed in the Honegger building.

April 22, 1970, after depopulation and repopulation plaintiff's herd was re-accredited and remained accredited at the time of trial.

December 16, 1970, plaintiff filed a petition in four divisions. He separately alleged causes of action based upon: (1) implied warranty; (2) express warranty; (3) negligence; and (4) strict liability. Defendant in answer to each division admitted some allegations and denied others. At the conclusion of all evidence the cause was submitted to the jury on the issues of breach of implied warranty and breach of express warranty.

Plaintiff's theory of recovery as asserted in the two divisions of the petition submitted to the jury is based on the contention his accreditation was lost because of the presence of atrophic rhinitis in his herd; that the environmental conditions of the thrive center were a cause, or at least a contributing cause, of the hog disease and his damage.

In support of his theory plaintiff offered evidence that the design, construction and instruction for use of the ventilating system installed by defendant for use in the thrive center were defective permitting a build-up and accumulation of deleterious gases in the facility, a by-product of the hog waste which dropped through the slatted floor into a concrete manure pit directly under the hog house. These gases would include ammonia, carbon dioxide, nitrous oxide, nitrogen dioxide, hydrogen sulphide and methane gas, none of which were beneficial to the hogs.

Plaintiff and his veterinarian experienced irritating odors which produced a burning sensation in the nostrils, respiratory discomfort and even nausea when working in the thrive center facility before modification of the ventilation system by plaintiff.

As the facility was initially constructed, the three ventilating fans were activated by thermostats and the only heat source other than the heat given off by the hogs themselves was from 12 3000 BTU heaters. The building is essentially air-tight. However, in the winter the temperature would not rise sufficiently in the facility to activate the fans because of insufficient heat source. The louvers on the ventilators

would ice over in the winter. There also was excessive mosiure built up in the facility.

After plaintiff's hogs developed the rhinitis problem, he modified the ventilation system by installing a 75,000 BTU heater and activating the fans by means of a time clock in addition to the thermostats. This modification alleviated the ventilation problems.

■ As stated, this is a law action. Our appellate jurisdiction is not de novo but is confined to correction of errors assigned. Rule 334, Rules of Civil Procedure.

The two issues presented for review by defendant's appeal are both directed to the trial court's failure to sustain defendant's motion for directed verdict made at the close of plaintiff's evidence and renewed at the close of all evidence and to sustain defendant's motion for new trial and judgment notwithstanding the verdict.

I. Defendant contends in support of its first assignment plaintiff failed to sustain his burden of proving a causal connection between any alleged defect in the Honeggers' building and the atrophic rhinitis diagnosed in plaintiff's hog herd which resulted in plaintiff's loss of his SPF accreditation. It argues the court erred in not withdrawing from the jury any consideration of damages alleged to have been sustained as a result of plaintiff's loss of his SPF accreditation as well as any claim for future damages alleged to have been sustained.

■ It is our view plaintiff had the burden, under the pleadings involved, to establish by a preponderance of the evidence that a defect in the design, construction or installation of the Honeggers' building was a substantial factor in causing damages to plaintiff's hog herd. This means it was plaintiff's burden to establish that the improper design, construction or installation of this facility and the appurtenances thereto caused a build-up

and accumulation of gases in the housing facility which resulted in the atrophic rhinitis diagnosed in his herd.

■ In Frederick v. Goff, 251 Iowa 290, 298, 100 N.W.2d 624, 629, in considering the causal relation necessary to responsibility for harm resulting in damage to another, this court with apparent approval repeated the following statement of principle from Restatement, Second, Torts, section 431:

"The actor's negligent conduct is a legal cause of harm to another if (a) his conduct is a substantial factor in bringing about the harm, and (b) there is no rule of law relieving the actor from liability because of the manner in which his negligence has resulted in the harm."

In several recent decisions we have repeated this statement. See Federated Mutual Imp. & H. Ins. Co. v. Dunkelberger, 172 N.W.2d 137, 144 (Iowa 1969); Andrews v. Struble, 178 N.W.2d 391, 398 (Iowa 1970), and cases cited in these opinions.

Although the cited cases making reference to the foregoing statement of principle are negligence cases, it is logical that causation sufficient to generate a jury question would be identical whether one is dealing with negligence or breach of warranty.

Defendant concedes plaintiff's loss of his SPF accreditation was due to the diagnosis of infectious atrophic rhinitis in his herd. The question is whether the alleged defect in the thrive center was a substantial factor in bringing about contraction of the disease.

Defendant does not contest plaintiff's contention set out earlier that the ventilating system installed by defendant for use in the thrive center permits a build-up and accumulation of deleterious gases in the facility, a by-product of the hog waste which dropped through the slatted floor into a concrete manure pit directly under the hog house and that these gases would

include ammonia, carbon dioxide, nitrous oxide, nitrogen dioxide, hydrogen sulphide and methane gas. But defendant takes the position the thrive center, no matter how allegedly defective, could not have caused plaintiff's herd to contract athrophic rhinitis as the disease can only be caused by disease organisms. Therefore, plaintiff's damage could only have occurred because of the contraction of the disease organisms in his livestock.

There appears to be some difference of opinion among the experts as to how rhinitis is caused.

Plaintiff on the other hand maintains the deleterious gases themselves actually caused the atrophic rhinitis condition or if the atrophic rhinitis condition involved a bacterial organism, as contended by some, the gaseous irritants and moisture in the farrowing house greatly influenced the pigs' susceptibility to any such organism. The improper ventilation system which resulted in extremely high moisture or humidity conditions would further tend to promote the incubation and growth of any such organism and decrease the pigs' resistance thereto. Hence, plaintiff maintains he has sustained his burden to establish causation under either condition.

██ If the matter before the tribunal for determination is one in which opinion testimony, either lay or expert, is necessary or proper, the witness may express his opinion either as to the *possibility, probability,* or *actuality* of the matter of fact about which he is interrogated, and the answer will not be an invasion or usurpation of the province or function of the jury, even though it passes upon an ultimate fact which the jury must determine. Grismore v. Consolidated Products Co., 232 Iowa 328, 361, 5 N.W.2d 646, 663; Brower v. Quick, 249 Iowa 569, 580, 88 N.W.2d 120, 126.

██ When considering a motion for directed verdict and judgment notwithstanding the verdict the court is required to view the evidence in the light most favor-able to the party against whom the motions were made regardless of whether it is contradicted and every legitimate inference that may be fairly and reasonably deducted therefrom must be carried to the aid of the evidence. McClenahan v. Des Moines Transit Co., 257 Iowa 293, 296, 132 N.W. 2d 471, 473; Jackson v. Brown, 164 N.W. 2d 824, 826 (Iowa 1969); Schneberger v. Glenn, 176 N.W.2d 782, 784 (Iowa 1970); Leasing, Incorporated v. Gage, 199 N.W.2d 43, 44 (Iowa 1972), and authorities cited in these opinions.

With the foregoing principle in mind we examine plaintiff's evidence.

Winter first offered the expert testimony of Dr. Fred J. Wood, a practicing veterinarian in Osceola since 1959 with a degree of Doctor of Veterinary Medicine from Iowa State University in 1958. Wood had been acquainted with Winter's SPF program since its inception, having made frequent inspections and the quarterly inspections required. He was familiar with the Honeggers' Thrive Center farrowing house constructed on Winter's farm, had been inside many times and observed problems with the house.

The following is a portion of his testimony shown by the record:

"Q. Doctor, I am going to ask you for a moment to assume that Dr. Maynard Spear, a Veterinarian at Iowa State University, diagnosed atrophic rhinitis upon a slaughter check of certain carcasses from the hogs of the Ernest Winter herd on or about January 25, 1968. Now, based upon that assumption, do you have an opinion, based upon a reasonable degree of medical probability, as to the cause of that condition? Now, I am just asking you if you have an opinion. A. I have an opinion; yes.

"Q. What is that? A. I feel that exposure of tiny piglets to respiratory irritants such as these gases that are involved in this building could definitely be a contributing factor to turbinate damage and in these

pigs it would show up at a later age due to the improper development of the turbines because they were damaged as tiny piglets.

"Q. Do you have an opinion as to whether that was the cause of the atrophic rhinitis diagnosed on or about January 25, 1968? A. I feel in my mind that it was a contributing factor. There are many possible and probable contributing factors involved in atrophic rhinitis, and it would seem possible that anything that can cause severe, deep mechanical or infectious irritation in these turbines when these pigs are very tiny, very small, could lead to turbinate damage and distortion at a later age."

Dr. Wood expressed the view at another point in his testimony, "Any time there is a moisture problem to the extent that we had in this building where we had wet floors, water dripping from the pipes and walls, and the condition of relative warmth in, there is an excellent media for bacterial organisms, * * * to grow and survive, and quite a contamination can build up in a building under these circumstances. Also this highly humid air causes a lot more respiratory problems to baby pigs when they live under these conditions."

This witness was later asked another hypothetical substantially identical to the one set out earlier. Specifically the witness was asked if he had an opinion based upon a reasonable degree of medical certainty as to what caused these conditions in Winter's hogs. In response he said: "According to the report as received by Mr. Winter, the organism of Bordetella bronchiseptica has been cultured. I feel that there are a number of contributing factors to atrophic rhinitis, and I feel that the turbinate damage created by this farrowing house gas problem could definitely be a contributing factor in the ability of the Bordetella to invade the turbines and sinuses."

When asked if in his opinion the contributing cause referred to was definitely a proximate cause of the condition the witness responded: "A. No, I can't say definitely, I say I feel it is a contributing factor.

"Q. Would you have an opinion as to whether this condition probably caused it? A. Probably.

"Q. That is your opinion."

Dr. Wood described in some detail the conditions and problems experienced in the farrowing facility during the period when it had an inadequate climate control system. After conversions were made consisting of an added heating unit and a time clock for operation of the ventilating system, the apparent upper respiratory distress subsided, death loss subsided and few scour problems were experienced. He also related that other hog herds in the area in which boars and gilts purchased from the Winter herd before plaintiff lost his accreditation were never disqualified. The herd was operating under different circumstances.

This was one factor which indicated to the witness the atrophic rhinitis condition diagnosed in Winter's hogs was probably caused by the environment in Honeggers' building.

Dr. William P. Switzer, described by one defendant witness as "probably the outstanding authority in respiratory diseases of swine," testified on cross-examination that in one of his articles he had noted, "that prolonged chemical irritation of the nasal cavities of experimental pigs frequently produced rhinitis with turbinate atrophy." This occurred when Dr. Switzer used a vinegar solution. He also found prolonged chemical irritation of the nasal cavities of experimental pigs frequently produced rhinitis with turbinate atrophy when he used acetic acid installed internasally.

 In connection with Dr. Switzer's testimony it is deemed advisable, in view of defendant's argument, to point out when a defendant introduces evidence after denial of his motion for directed verdict made at

the close of plaintiff's evidence the court should consider the entire record, including defendant's evidence, when ruling on defendant's motion to direct renewed at the close of all evidence. State v. Niccum, 190 N.W.2d 815, 823 (Iowa 1971). Stated otherwise, any alleged error in refusing to direct a verdict at the close of plaintiff's case is not available to defendant, where he thereafter introduces evidence curing defects in plaintiff's case; and in passing on the sufficiency of evidence the court must look to the whole record as finally made. Andreas v. Hinson, 157 Iowa 43, 45–46, 137 N.W. 1004, 1005.

Defendant insists Dr. Wood's testimony is not sufficient to create a jury question on the issue as to whether there was a causal relationship between the alleged defects in the Honeggers' farrowing facility and the atrophic rhinitis diagnosed in Winter's herd. It contends this witness' testimony, even though it be argued the same was corroborated by Dr. Switzer, was nothing more than a statement of mere possibility, speculation or conjecture, rather than probability necessary to generate a jury question.

In this regard we refer to the annotation in 135 A.L.R. 516, 517, in which the author says:

" * * * By testimony as to possibility is meant testimony in which the witness asserts that the accident or injury 'might have,' 'may have,' or 'could have' caused, or 'possibly did' cause the subsequent physical condition or death or that a given physical condition (or death) 'might have,' 'may have,' or 'could have' resulted or 'possibly did' result from a previous accident or injury—testimony, that is, which is confined to words indicating the possibility or chance of the existence of the causal relation in question and does not include words indicating the probability or likelihood of its existence, * * *."

■ ■ This court has announced that expert testimony indicating that it is possible a given factual circumstance was the cause of plaintiff's injury or "could have caused it" is insufficient, standing alone, to generate a fact question. Expert testimony indicating probability or likelihood of a causal connection is necessary for this purpose. However, when testimony of an expert witness that a described condition is merely "possible" or "might" exist as a consequence of a stated cause is coupled with other testimony, nonexpert in nature, that the described condition of which complaint is made did not exist before occurrence of those facts alleged to be the cause thereof, a fact question as to causal relation is generated. Rose v. John Deere Ottumwa Works, 247 Iowa 900, 910–911, 76 N.W.2d 756, 761–762; Chenoweth v. Flynn, 251 Iowa 11, 17–18, 99 N.W.2d 310, 313–314; Bradshaw v. Iowa Methodist Hospital, 251 Iowa 375, 379–380, 101 N.W. 2d 167, 171–172; Schneider v. Swaney Motor Car Co., 257 Iowa 1177, 1188, 136 N. W.2d 338, 345; Giere v. Aase Haugen Homes, Inc., 259 Iowa 1065, 1072, 146 N. W.2d 911, 915–916; Mabrier v. A. M. Servicing Corporation of Raytown, 161 N.W. 2d 180, 182–183 (Iowa 1968).

Dr. Wood's testimony, when viewed in the light most favorable to plaintiff, establishes the first part of the foregoing test for submission to the jury of the question of causal relation; that first part being expert testimony as to the possibility of a causal connection between the incident and the injuries or damages complained of.

The second part of the test requires other nonexpert testimony plaintiff's herd was not afflicted with atrophic rhinitis before use of the Honeggers' facility.

Plaintiff testified extensively in regard to the condition of his hogs prior to the use of the thrive center; generally he had had no health problems with his SPF herd prior to use of the thrive center. He further testified his records or carcass checks of parts of his herd showed no health problems were present. Visual carcass checks made at Hormels Packing House in Des Moines all showed no evidence of hog disease.

In brief, from August 26, 1965, until August 8, 1967, all hog examinations were satisfactory. After the center was constructed and until plaintiff himself began making modifications in the fall of 1969, several examinations of hogs farrowed in the center were made. Three examinations were unsatisfactory. His hogs were free of atrophic rhinitis or infectious atrophic rhinitis as demonstrated by the fact that he became an accredited SPF breeder in 1965. His accreditation continued until January 1968, or approximately six months after the installation of the Honeggers' building. There is substantial, competent evidence in the record tending to corroborate plaintiff's contention his hogs were free of atrophic rhinitis or infectious atrophic rhinitis before use of the farrowing center.

■ Plaintiff's testimony coupled with the evidence given by Dr. Wood was sufficient to present a fact question on the issue of causal relation between defect in the design, construction or installation of the Honeggers' building and the damage to plaintiff's hog herd.

■ There may be more than one substantial factor in bringing about a harm. Andrews v. Struble, 178 N.W.2d at 398.

The trial court did not err in any of the respects urged by defendant in its first assignment.

II. Defendant's second assignment challenging the trial court's failure to sustain its various motions is predicated upon the contention plaintiff had failed to introduce evidence tending to establish the giving of notice of alleged defects in the thrive center to the defendant until commencement of the present lawsuit.

Defendant also argues the court erred in withdrawing from consideration of the jury the issue of notice of defect and in failing to instruct on plaintiff's duty in this respect.

Plaintiff alleged in each division, "that proper, adequate and timely notice of said hog illnesses and diseases and damages and their cause was given to the defendants herein." Defendant in answer denied these allegations generally without stating any facts upon which the denial was based.

Defendant's motion for directed verdict made at the close of plaintiff's case did not include or allege failure to sustain the burden of proof in regard to sufficient notice. Defendant's motions renewed at the end of all the evidence were overruled. It then moved to strike from plaintiff's petition paragraph 15 of division I (re notice of damages) and paragraph 17 of division II (notice allegation) and therefore from the jury's consideration, the damages allegedly caused. The court overruled the motion to strike in regard to notice.

Defendant further made exception to jury instructions 4, 5 and 8 for the reason they made no reference to the duty of plaintiff to give notice to defendant of alleged defects in the product. In its motion for new trial defendant alleged the court erred in failing to grant its motion to strike from the pleadings and therefore withdraw from jury consideration paragraph 15 of division I and paragraph 17 of division II. The trial court specifically overruled defendant's motion for new trial.

The question as to whose duty it was to plead and prove notice of alleged defects is the first problem to be determined in deciding the merits of this assignment.

The Uniform and Commercial Code as adopted in Iowa appears in chapter 554 of our Code. The following portions of that chapter are pertinent to a determination:

Section 554.2607(3)a—"Where a tender has been accepted * * * The buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy; * * *."

Section 554.2714(1)—"Where the buyer has accepted goods and given notification (subsection (3) of section 554.2607) he may recover as damages for any noncon-

formity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.

"2. * * *

"3. In a proper case any incidental and consequential damages under the next section may also be recovered."

Section 554.2715(2)b—"Consequential damages resulting from the seller's breach include * * * b. injury to * * * property proximately resulting from any breach of warranty."

The editors of 67 Am.Jur.2d, Sales, section 728, in discussing buyer's remedies for breach of warranty or other breach in regard to accepted goods, state:

" * * *

"The burden was upon the one claiming the breach to plead and prove notice within a reasonable time. * * *

"The Uniform Commercial Code generally goes along with pre-Code law with respect to requiring notice of breach. Although acceptance of the goods, under the Code, does not of itself impair any other remedy for nonconformity provided under the Sales Article, it is required that where a tender has been accepted, the buyer must within a reasonable time after he discovers or should have discovered any breach, notify the seller of breach or be barred from any remedy.

" * * *

"As under pre-Code law, it is necessary that the giving of notice be pleaded as a condition precedent to recovery."

The last quote above cites L. A. Green Seed Company of Arkansas v. Williams, 246 Ark. 463, 438 S.W.2d 717. Plaintiff-appellee, a commercial grower of tomatoes, sued defendant-appellant for breach of warranty by appellant in the sale of tomato seeds. Appellant demurred to plaintiff-appellee's amended complaint and was overruled; appellant refused to plead further

and the trial court, sitting as a jury, heard evidence and afforded damages to appellee. Defendant appealed.

In his second assignment of error, based upon Arkansas Statutes Annotated, section 85–2–607(3)(a) [which is U.C.C. 2–607(3)(a) and section 554.2607(3)(a), The Iowa Code] appellant contends the complaint was defective because it does not contain an allegation of notice to appellant with respect to the claimed breach of warranty. The court stated: "We must agree with the appellant that the appellee's complaint is subject to a demurrer since it does not contain an allegation of notice." *Id.* 438 S.W.2d at 719.

Noting that this issue was one of first impression in Arkansas, the court cited the following lower court opinions from other jurisdictions which held also that the giving of notice must be plead as a condition precedent to recovery: Avant Garde, Inc. v. Armtex, Inc., 4 U.C.C.Rep.Serv. 949, (1967), a decision of a New York Supreme Court; Holowka v. York Farm Bureau Coop. Assn., 2 U.C.C.Rep.Serv. 445 (1963), a decision by a Pennsylvania trial court. (*Holowka*, supra, was also set out in Annot., 17 A.L.R.3d, section 43, p. 1111).

The opinion continues:

"In *Avant Garde,* the court said:

" ' * * * While plaintiff alleges unfitness, there is no allegation of notice of defect given within a reasonable time or at any time (Uniform Commercial Code, § 2–607[3][a].' The court held the complaint failed to state a cause of action for failure to allege notice." *Id.* 438 S.W.2d at 719.

This Arkansas court also stated that the notice requirement, as a condition precedent to recovery, was the majority's view under the Uniform Sales Act, or where there is other statutory requirement of notice; numerous cases were cited in support. See *L. A. Seed,* 246 Ark., at 463, 438 S.W.2d, at 719.

The facts in *L. A. Seed* are quite similar to those of *Winter*; the theory of recovery is implied warranty and the U.C.C. section 2–607(3)(a) is involved. Although *Winter* involves property damage rather than personal injury as in *L. A. Seed*, this difference is irrelevant because of section 554.-2715(2)(b), The Code, wherein damages may be had for personal or property damage. Plaintiff there had the burden to plead notice; failure to do so rendered his complaint subject to a demurrer or motion to dismiss.

In the comment to section 554.2607 I.C.A. by David Stanley and Charles Coulter it is stated that section 554.2607(3)(a), The Code, is "in accord" with former section 554.50, The Code, 1962, which provided:

"Acceptance does not bar action for damages. In the absence of express or implied agreement of the parties, acceptance of the goods by the buyer shall not discharge the seller from liability in damages or other legal remedy for breach of any promise or warranty in the contract to sell or the sale. But if, after acceptance of the goods, the buyer fails to give notice to the seller of the breach of any promise or any warranty within a reasonable time after the buyer knows, or ought to know, of such breach the seller shall not be liable therefor."

The case of Smith v. Pizitz of Bessemer, Inc., 271 Ala. 101, 122 So.2d 591, 593, interpreted an identical statute in regard to an implied warranty case. *Smith* was an action by the purchaser of a nightgown for breach of implied warranty as to fitness of the article. Trial court sustained a demurrer to plaintiff's complaint; affirmed. In interpreting section 55, Title 57, Code of 1940, which is identical to section 554.50 of the Iowa Code, 1962, the Alabama court held that the allegation of notice as provided in the statute is a condition precedent to recovery and therefore must be alleged in plaintiff's complaint. The court cited 2 Harper & James, Torts, section 2817 and eight cases from other juris-dictions holding that such notice should be alleged in the complaint as a condition precedent to recovery.

Winter argues that rule 103, R.C.P., (entitled "All Defenses in Answer," concerning defenses in bar or abatement) should apply here, thereby placing the burden upon the defendant to allege facts constituting such bar. This theory would excuse plaintiff from making any notice allegations whatsoever. His argument apparently arises from the fact that the term "bar" is specifically used in 554.2607(3)(a), The Code. No authority has been found, however, holding that under U.C.C. 2–607(3)(a) the defendant must plead notice as a bar, or otherwise in the manner of any affirmative defense.

This court has interpreted section 554.50, The Code, 1962, in Dailey v. Holiday Distributing Corp., 260 Iowa 859, 873, 151 N.W.2d 477, 487, as requiring, "Notice of breach of any promise or warranty must be given within a reasonable time." The case did not, however, confront the issue of which party had the duty or obligation to plead notice. It does hold for the principle that notice is necessary before plaintiff may recover. This is concurred in by what appears to be the view of the majority of the American courts. Smith v. Pizitz of Bessemer, Inc., 271 Ala. at 103, 122 So. 2d at 593. See also Annot., 71 A.L.R. 1149.

We are not persuaded to adopt plaintiff's argument in this respect which is based on rule 103, R.C.P.

Winter also argues that the defense of insufficient notice is comparable to a defense of the statute of limitations. This contention was rejected in *Smith*, 271 Ala. at 102, 122 So.2d at 592, where the court said: "The requirement of notice is not in the nature of a statute of limitations but is a condition precedent to recovery by the buyer. De Lucia v. Cocoa-Cola Bottling Co. of Conn., 139 Conn. 65, 89 A.2d 749; 3 Williston, Sales § 484(a) Rev.Ed.1948."

In construing section 554.-2607(3)(a), The Code, which requires a buyer to give notice of a breach of warranty to the seller within a reasonable time after the buyer discovers, or should have discovered, the alleged breach, it is our opinion the giving of the notice must be pleaded as a condition precedent to recovery.

III. Plaintiff argues alternatively that even if it shall be found plaintiff had the duty to allege notice he fulfilled this duty by a general or conclusionary allegation of a condition precedent consistent with rule 98, R.C.P.

This rule provides in part:

*"Permissible Conclusions; Denials Thereof.* * * * [P]erformance of conditions precedent * * * may be pleaded as legal conclusions, without averring the facts comprising them. It shall not be sufficient to deny such averments in terms contradicting it, but the facts relied on must be stated."

Thus, if the notice requirement is a condition precedent, plaintiff's allegation would be sufficient and defendant's general denial in his responsive pleading is inadequate to put in issue the question of performance or occurrence of the condition precedent. There is merit in plaintiff's position in this regard.

In Henschel v. Hawkeye-Security Insurance Company, 178 N.W.2d 409, 417–420 (Iowa 1970), this court discussed the procedural issues in regard to conditions precedent. In definition the court stated:

"The 'conditions precedent' referred to are those the performance or occurrence of which are prerequisite to a claim on which relief can be granted. Treasure State Industries, Inc. v. Leigland, 151 Mont. 288, 295–296, 443 P.2d 22, 26, where the court was interpreting its rule 9(c) which is taken verbatim from the federal rules.

"Our rule 98, R.C.P., is also based primarily on federal rule 9(c) * * *.

"For pleading purposes, at least, a condition precedent is one whose performance or occurrence plaintiff must prove in order to recover. * * *

"* * *

"A general denial in a responsive pleading will not put in issue the question of ˈ performance or occurrence of a condition precedent. * * *."

In regard to federal rule 9(c) .it has been noted that, "By its terms the federal rule * * * is not restricted in application to contract actions; * * *." Wright & Miller, 5 Federal Practice and Procedure: Civil, section 1303. The case cited as authority is Weir v. United States, 310 F.2d 149, 155 (8 Cir. 1962). In *Weir* the United States had sued Weir, a rice producer, to recover a penalty against him for producing more rice than his quota allowed. The United States had alleged compliance with all statutory conditions precedent pursuant to rule 9(c); defendant Weir in answer denied generally this allegation. Weir made no attempt in answer to set out any specific basis for his contention that the Secretary had not complied with the conditions.

The case thus demonstrates that statutory conditions precedent could be alleged generally under rule 9(c). It would appear that such statutory conditions precedent are indistinguishable from conditions precedent as used in contract law in this circumstance.

The authorities cited earlier do not discuss what must be alleged, or the particularity of the allegations; they hold only that the giving of notice must be alleged by plaintiff. There are various principles in regard to requirements for sufficiency as to the notice itself, but such are distinguishable from any sufficiency requirements which might apply to an allegation of notice in a petition. Thus, for example, the notice given the seller by the buyer must be timely made and state that difficulty has been encountered with their product; but the notice allegation of the peti-

tion might simply state that notice was given the buyer without giving any further details. Dailey v. Holiday Distributing Corp., 260 Iowa at 873, 151 N.W.2d at 487.

We hold the requirement that the buyer plead in his petition as a condition precedent to recovery the fact notice of breach of warranty has been given the seller may be complied with by alleging such fact in the manner provided by rule 98, R.C.P.

If a seller wishes to place notice in issue he is required to deny the buyer's general allegation of performance and to specifically plead those facts relied on to controvert this allegation. He cannot raise an issue of nonperformance by a general denial.

"This distribution of the pleading burden does not affect or shift the burden of proving performance or occurrence, which generally will be on plaintiff *as to any condition challenged by defendant.*" (Emphasis supplied). Wright & Miller, 5 Federal Practice and Procedure: Civil, section 1304. See *Henschel,* 178 N.W.2d at 418, where the above quote is cited with approval. See also Comment, 2 Iowa Rules of Civ.Proc., rule 98.

Honeggers' denial of paragraph 15 of division I and paragraph 17 of division II failed to create a fact issue as to the question of notice.

Permitting the buyer to thus allege the giving of notice of breach of warranty in a conclusionary manner pursuant to rule 98, R.C.P., would not affect the substantive requirements of the notice itself. All elements of the notice required by law in regard to time, place, manner and particularity would remain.

Since we have held a fact issue as to notice was not created, the trial court was correct in denying the various motions of defendant considered in this assignment and in overruling objections and exceptions to instructions given even though the court saw fit to place its ruling on a different basis.

Every contention urged by defendant in support of its two assignments of error has been considered whether specifically mentioned herein or not.

Finding no error, the case is therefore —Affirmed.