642 F.2d 1101
 30 UCC Rep.Serv. 1533
 Stuart McKNELLY, Appellant,
v.
SPERRY CORPORATION, a Delaware Corporation; Sperry Rand
Corporation, a Delaware Corporation; Vickers, Incorporated,
a Delaware Corporation; Vickers, Incorporated, a Delaware
Corporation, d/b/a Tulsa Products Division and as Vickers
Tulsa Division, Appellees,
and
Motor Truck Equipment Corporation, a Texas Corporation.
 No. 80-1046.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 10, 1980.
Decided Feb. 19, 1981.
Rehearing and Rehearing En Banc Denied March 16, 1981.
 
 1
 Lynn W. Toedte, Toedte & Sandblom, and Daniel Lee English, Denver, Colo., for appellant.
 
 
 2
 Ralph W. Gearhart, Richard S. Fry, of Shuttleworth & Ingersoll, Cedar Rapids, Iowa, for appellees.
 
 
 3
 Before LAY, Chief Judge, HEANEY, Circuit Judge, and PORTER,* District Judge.
 
 
 4
 DONALD J. PORTER, District Judge.
 
 
 5
 In this diversity action for personal injuries, Stuart McKnelly brought suit against Sperry Corporation upon theories of strict liability, negligence, and breach of express and implied warranties. Each of these theories related to the manufacture and sale by Sperry of a Model 23 Tulsa winch. McKnelly now appeals from a judgment on jury verdict for Sperry. For reversal, he urges the district court erred (1) in directing a verdict for Sperry on the warranty theories; (2) in answering the jury's inquiry during deliberations without securing the presence of McKnelly's counsel; and (3) in permitting Sperry's witness to answer an improper hypothetical question. We reverse in part, remanding the express warranty count for jury determination, but otherwise affirm the judgment of the district court.
 
 FACTUAL BACKGROUND
 
 6
 On May 4, 1975, McKnelly was seriously injured in a fall from a radio tower near Hudson, Iowa. McKnelly was engaged in installing an FM antenna on the 400 foot tower. By means of a Sperry Model 23 Tulsa winch, he was being hoisted up the tower on a heavy metal cylinder attached to a steel cable, which was rigged to the tower with pulleys. The cable slipped over the edge or flange of the winch drum, and was somehow severed in the undercarriage of the winch. McKnelly fell one hundred feet.
 
 
 7
 McKnelly's employer, James Tiner, had purchased the winch in June 1970 through Motor Truck Equipment in Dallas, Texas. Motor Truck had been an authorized distributor[1] of Sperry winches for years. Tiner testified that he told Motor Truck he needed a device suitable for hauling both personnel and materials to great heights, and that Motor Truck recommended modifying a Model 23 winch to increase its cable capacity.
 
 
 8
 At Tiner's request, a South Dakota truck equipment company added metal rings to extend the winch's drum flanges about three inches. There was testimony that this modification may have contributed to causing the cable to overrun the flange and be severed.
 
 
 9
 Sperry had advertised the Model 23 winch in 1970 as a "general purpose winch". Sperry also warranted that the winch was free from material or workmanship defects and conformed to applicable specifications. Sperry's evidence indicated that as a matter of long-standing company policy, Sperry did not approve the use of Tulsa winches for personnel lifting. Sperry also maintained this policy was communicated to and generally known among distributors. However, the policy was not committed to writing until a written bulletin was issued to distributors in 1973. In 1975, the same warning was published in Sperry's catalog and the expression "general purpose winch" was deleted.
 
 
 10
 Sperry also maintained there is a distinction, generally known in the industry, between "winches" and "hoists". A winch was defined as a device for intermittent hauling of heavy loads at slow speed, while a "hoist" is for continuous pulling of light loads, commonly personnel, at high speeds. One of McKnelly's experts, however, testified that in the field, winches are commonly used to haul personnel, and that in his opinion, distributors who get out in the field would know of this practice.
 
 
 11
 In contrast to the winch used here, devices approved for personnel contain additional features to help prevent cable overrun or to prevent or slow a fall in the event of cable failure. These might include: cable leveling devices or cable guards, automatic braking or cable speed control devices; a secondary, backup cable or "lifeline", or a cage or compartment to contain personnel.
 
 
 12
 There was evidence that in addition to lacking such features, the winch spooled in cable under rather than over the drum, making it more difficult for an operator to see whether the cable is overrunning the flange.[2]
 
 
 13
 At the close of the evidence, the district court refused to submit either implied or express warranty to the jury. The remaining theories went to the jury at 2:00 p. m., and counsel were asked to leave phone numbers where they could be reached in the event of verdict or a question. McKnelly's two attorneys left their hotel phone number. They called the court at 4:00 p. m. to say they were going to the airport to change ticket reservations, and again at 5:00 p. m., at which time they were given the bailiff's after-hours number.
 
 
 14
 At 5:08 p. m., the court received a note from the jury, reading, "Under strict liability list the items. Does defendant have to be guilty under all areas?"
 
 
 15
 The court directed the clerk to summon counsel. An attorney for Sperry reported promptly in response to a call, but the clerk could not reach McKnelly's counsel at their hotel number. A law clerk was sent to search the hotel's lobby and public areas. He found the McKnellys, who said their attorneys had left to rent a car at the airport. McKnelly's parents then called two airport car rentals without success. Finally, the court three times had McKnelly's counsel paged at their hotel.
 
 
 16
 At 5:56 p. m., the court showed the inquiry to Sperry's counsel in chambers and, without objection, submitted a copy of the instructions and the following written response to the jury at 6:08 p. m.: "Members of the jury, in answer to your question, herewith is a copy of the Court's instructions that were read to you. Your attention is called to Instruction No. 14 (reciting the elements of strict liability) which should answer your inquiry".
 
 
 17
 McKnelly's counsel state that although they called the court's night number at 5:40 p. m. without answer, they did not return to their hotel until about 6:10 p. m., at which time they learned they had been required in court. On the way to the courthouse at about 6:20 p. m., counsel met the trial judge on the street, who advised that a question had been received at 5:08 p. m. and answered at 6:08 p. m. The judge continued in the opposite direction, and counsel obtained a copy of the question and answer from the bailiff at the courthouse. The jury reached a verdict at 6:45 p. m.
 
 
 18
 In the roughly twenty-minute period between counsel's learning of the question and answer and the jury's reaching a verdict, McKnelly's counsel did not attempt to contact the court or raise any objection. The first objection to the court's handling of the jury question was presented two weeks later, in McKnelly's motion for new trial.
 
 DISCUSSION
 I.
 
 19
 We first address the trial court's refusal to submit the implied and express warranty theories.
 
 
 20
 As we have held before, the Iowa and federal standards for passing on motions for directed verdict are substantially the same. Simpson v. Skelly Oil Co., 371 F.2d 563, 567 (8th Cir. 1967). Although varying formulations are possible, the test generally is whether, taking the evidence most favorably to plaintiff, and giving him the benefit of all inferences reasonably to be drawn in his favor, there is sufficient evidence to support a verdict. Id; see also Ozark Air Lines, Inc. v. Larimer, 352 F.2d 9, 11 (8th Cir. 1965); Bankers Life & Casualty Co. v. Kirtley, 307 F.2d 418, 421-22 (8th Cir. 1962); The trial court as well as this court may not consider the credibility of the witnesses or the weight of the evidence.[3] Bankers Life & Casualty Co. v. Kirtley, supra, 307 F.2d at 422.
 
 
 21
 We need not apply these standards, however, to the directed verdict on implied warranty. Although we assume without deciding that the evidence was sufficient to submit this theory, we must also recognize that as a matter of Iowa products liability law implied warranty ordinarily need not be submitted where strict liability and negligence are fully submitted. The Iowa Supreme Court takes the view that strict liability is ordinarily in lieu of a theory of implied warranty, and both theories should be submitted only in "exceptional situations." This is because, as a practical matter, the issues under implied warranty are adequately submitted under strict liability, particularly in a personal injury as opposed to an economic injury action. Hawkeye Security Insurance Co. v. Ford Motor Co., 199 N.W.2d 373, 381-82 (Iowa 1972) ("Hawkeye II "). Hawkeye Security Insurance Co. v. Ford Motor Co., 174 N.W.2d 672, 684 (Iowa 1970) ("Hawkeye I ").
 
 
 22
 We have carefully examined the record and are not persuaded the factual situation here was so exceptional that both strict liability and implied warranty theories should have been submitted as a matter of right.[4] Therefore, we find no prejudice to McKnelly in the directed verdict for Sperry on implied warranty.
 
 
 23
 We turn next to the district court's refusal to submit express warranty. The district court recognized that Hawkeye I and II, supra, do not forbid submission of express warranty along with strict liability. The district court, however, determined that the evidence of express warranty was insufficient to go to the jury.[5] Applying the appropriate standards for a motion for directed verdict, we cannot agree.
 
 
 24
 Sperry advertised the Model 23 as a "general purpose winch." The trial court, relying on the distinction in the industry between "hoists" and "winches", and upon testimony that Sperry never approved its winches for personnel lifting, concluded that the Model 23 was warranted only for those uses generally made of winches which, the court reasoned, excluded personnel lifting.[6] On appeal, this is Sperry's chief defense of the directed verdict.
 
 
 25
 We believe the central inquiry was this: What was warranted by the words, "general purpose winch"? that is, what could the purchaser reasonably understand those words to mean? Viewing the evidence most favorably to McKnelly, we think a jury could find that the purchaser reasonably would take the words "general purpose winch" to warrant that the winch was suitable for lifting personnel as well as materials, when in fact it was unsuitable for safely lifting personnel.
 
 
 26
 There was evidence favorable to Sperry that in the trade and among distributors winches were known to be disapproved for personnel and were known to be distinguished from "hoists." However, there was other evidence that Motor Truck a Sperry winch distributor for years knew of Tiner's need for an adequate personnel lifting device, and yet recommended he buy the Model 23 winch. From this the jury permissibly could infer that Motor Truck did not know the winch was disapproved for personnel lifting. If a longtime winch distributor did not understand that winches were not for personnel lifting, it cannot be said as a matter of law that the "general purpose winch" warranty did not extend to such use. The term "general purpose winch" was apparently subject to enough confusion so that Sperry decided to send a written warning to distributors in 1973, which was also published in its 1975 catalog, and to delete the words "general purpose" from the 1975 catalog. The jury could also credit expert testimony that winches were commonly used in the field for personnel lifting, and that distributors would know of this practice. We observe also that simply because a winch, by technical definition, is designed for slow, intermittent lifting of heavy loads, does not make it obviously unsuitable for personnel. On the contrary, a device capable of lifting many thousands of pounds might inspire confidence in its safety for lifting personnel.[7]
 
 
 27
 The district court's order also attached some importance to evidence that the winch was modified for personnel lifting.[8] However, we think the jury could find that the modification was intended only to allow for more cable, and did not alter the winch's fundamental inadequacy as a personnel device. As noted above, Sperry at all times maintained that the winch, as manufactured, was not approved or suitable for personnel. We acknowledge there was evidence that the modification may have helped create the "pinch point" between the flange and a steel rod, that severed the cable after it overran the drum. However, on this record it cannot be said as a matter of law that the modification was the sole cause of the accident. Rather, the jury could find that the winch's fundamental inadequacy as a personnel lift its lack of automatic braking or cable speed control devices, cable guards or levelers, or other safety features was a substantial concurring cause of McKnelly's injuries.
 
 
 28
 Though the district court did not address the point, Sperry also contends that McKnelly's failure to give Sperry notice of breach of express warranty until filing suit bars McKnelly from any remedy. I.C.A. § 554.2607(3)(a) (1967). Winter v. Honeggers' & Co., Inc., 215 N.W.2d 316 (Iowa 1974).
 
 
 29
 However, we are not persuaded the Iowa Supreme Court would, under all the circumstances here, hold the notice provision of the Uniform Commercial Code applicable to McKnelly's suit. By its terms, Section 2-607(3)(a) applies only to a buyer who has accepted tender of goods from a seller. It does not expressly apply as between an injured third person other than the buyer and a manufacturer instead of a seller. The official comments to the notice provision state that a beneficiary does not fall within the reason of the section in regard to discovery of defects and giving of notice within a reasonable time. I.C.A. § 554.2607(3)(a), comment 5 (1967).[9] And there is authority that the better view, both under the Uniform Commercial Code and the Uniform Sales Act, is that the notice provision is inapplicable to third parties, at least where personal injuries rather than economic losses are sustained. E. g., Tomczuk v. Cheshire, 26 Conn.Sup. 219, 217 A.2d 71 (Super.Ct.1965); Bennett v. Richardson-Merrell, Inc., 231 F.Supp. 150, 153-54 (D.Ill.1964); Chapman v. Brown, 198 F.Supp. 78, 85 (D.Hawaii 1961), aff'd 304 F.2d 149 (9th Cir. 1962); W. Prosser, Handbook of the Law of Torts § 98 at 655-56 (4th ed. 1971).
 
 
 30
 We thus conclude the jury could have found that (1) the purchaser reasonably understood the words "general purpose winch" to warrant it was adequate for personnel lifting; (2) this warranty became part of the basis of the bargain; (3) in fact, and as admitted by Sperry, the winch as sold was not adequate for safely lifting personnel; and (4) the winch's inadequacies as a personnel lift were a substantial concurring cause of injury to McKnelly. The district court thus erred and we reverse for a jury determination of the express warranty theory.[10]II.
 
 
 31
 We next turn to McKnelly's contention that the district court improperly answered a jury inquiry in the absence of McKnelly's counsel. He asserts error both in the court's acting in his counsel's absence and in the answer itself.
 
 
 32
 At the outset, we recognize the recurring difficulties presented by the failure of counsel timely to appear when a jury inquiry is received. Courts must be sensitive to the right of parties through their counsel to be present and to object prior to the giving of supplemental instructions to the jury. Fillippon v. Albion Vein State Co., 250 U.S. 76, 81, 39 S.Ct. 435, 436, 63 L.Ed. 853 (1919); Chicago, Rock Island & Pacific Railroad Co. v. Speth, 404 F.2d 291 (8th Cir. 1968); Arrington v. Robertson, 114 F.2d 821 (3d Cir. 1940). On the other hand, it is counsel's duty, as much as his right, to appear and be present at all times the court may be in session, from the time the jury is empaneled until it is discharged, irrespective of the hours. See MaCartney v. Compagnie Generale Transatlantique, 253 F.2d 529, 534-35 (9th Cir. 1958). A party through his counsel may, by voluntarily absenting himself from the courthouse without making adequate arrangements by which he can be reached, be deemed to waive his right to be present. Any other rule would permit an irresponsible attorney, by his absence, to render the court powerless. Id.
 
 
 33
 On this record, however, we decline to rule whether counsel's absence for over fifty minutes, by itself, constituted waiver. Nor do we express any opinion whether the district court was correct in relying on Local Rule 6(b)(3) (requiring counsel to appear within thirty minutes). We further find we need not determine whether the court's procedure or its answer was erroneous and prejudicial.
 
 
 34
 We need not pass on these sensitive questions, because the record is clear that McKnelly's counsel, after knowing of the question and the written answer submitted by the court in his absence, did not contact the court and advise he wished to object, nor did he voice any objection before the jury returned a verdict. The point was not raised at all until McKnelly's motion for new trial nearly two weeks after the verdict. Under these circumstances, even if we assume without deciding that the court's action was error, we hold McKnelly waived the error by failing to object before the verdict was returned.
 
 
 35
 McKnelly's counsel learned of the supplementary instruction at approximately 6:20 p. m. and obtained a copy minutes thereafter. The jury did not reach a verdict until 6:45 p. m. If counsel found the instruction objectionable, he could easily have obtained the judge's number from the bailiff and advised the judge that he wished to assemble in order to make an objection. The bailiff could have been asked not to release the jury until such time as a ruling was made on the objection. "Instead, counsel took his chances ... and raised his voice in protest against the procedure for the first time after the verdict was in and the issues had been determined adversely to his client. Under those circumstances, plaintiff is not in position now to complain." Cleary v. Indiana Beach, Inc., 275 F.2d 543, 546 (7th Cir. 1960); see also Truscott v. Chaplin, 403 F.2d 644, 645 (3d Cir. 1968); Macartney v. Compagnie Generale Transatlantique, 253 F.2d 529, 534-36 (9th Cir. 1958); Gleeson v. Wood, 321 F.Supp. 118, 121 (E.D.Pa.1970). Accordingly, we conclude McKnelly's claim of error was not preserved for our review.III.
 
 
 36
 McKnelly also asserts error in the district court's evidentiary ruling permitting Sperry's expert to speculate as to Sperry's response if in 1969 a customer asked for a personnel lifting device. James Morrow, an engineer for many years with Sperry, was asked by Sperry's counsel, "If somebody called up Tulsa Division down in Tulsa, Oklahoma, say, in 1969, and said, 'I want to make a man-lift or elevator. Have you got a winch that might be suitable for that?' What would he be told?" Morrow answered over objection, "We would tell him we don't have a winch suitable for a man-lift and he would have to seek other vendors."
 
 
 37
 Assuming for this appeal that the question was improper as calling for a speculative and self-serving answer, we nonetheless find no prejudice to McKnelly in the answer. Sperry throughout trial maintained the position that they did not, in 1969 or at any time, manufacture a personnel hoist or approve their winches for personnel lifting. In light of the other testimony in the record to this effect, we conclude Morrow's answer was, at worst, merely cumulative, and does not entitle McKnelly to reversal.
 
 CONCLUSION
 
 38
 Because we have concluded the district court improperly directed a verdict on McKnelly's theory of breach of express warranty, we reverse in part and remand that theory for a new trial. The judgment appealed from is otherwise affirmed.
 
 
 39
 Affirmed in part, reversed and remanded in part.
 
 
 
 *
 The Honorable DONALD J. PORTER, United States District Judge for the District of South Dakota, sitting by designation
 
 
 [1]
 It is not asserted that Motor Truck acted as Sperry's agent in dealing with Tiner. Motor Truck was a named defendant, but settled with McKnelly during trial
 
 
 [2]
 There was also evidence relating to Sperry's warranty that the winch met applicable specifications, and to Sperry's published representations as to cable capacity. It was not disputed that among the applicable specifications were the standards of the Society of Automotive Engineers (SAE). A SAE standard in effect in 1969-70 recommended that no more than 65 percent of the total cable capacity be wound on the winch drum. Although Sperry was not responsible for supplying or winding the cable, the winch involved here was, in fact, filled closer to the brim than recommended. There was expert testimony that Sperry's published representations relating to cable capacity were such that a person relying on the figures would fill the winch, whether as sold or as modified, well beyond the recommended level. This, in turn, could contribute to the cable's slipping off the drum. See note 10 infra
 
 
 [3]
 An alternative statement of the Federal test, which we feel does not depart in spirit from the Iowa standards, is whether the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion that reasonable men could have reached. Giordano v. Lee, 434 F.2d 1227, 1231 (8th Cir. 1970); Simblest v. Maynard, 427 F.2d 1, 4 (2d Cir. 1970); 9 C. Wright & A. Miller, Federal Practice & Procedure § 2524 at 545-46 (1971)
 
 
 [4]
 In this regard, the local district court's view of Iowa products liability law is entitled to great weight. E. g., Wollman v. Gross, 637 F.2d 544 at 547 (8th Cir. 1980)
 
 
 [5]
 Order on motion for new trial at 4
 
 
 [6]
 Id
 
 
 [7]
 The district court viewed McKnelly's contention as being "that unless a proposed use is specifically negated by the manufacturer it becomes part of some kind of express warranty." Order on motion for new trial at 5
 In our view the issue is not whether Sperry was obligated to negate every conceivable use; rather, it is simply whether a jury could conclude the purchaser reasonably understood the words "general purpose winch" to warrant the winch was suitable for lifting personnel.
 
 
 [8]
 Order on motion for new trial at 5
 
 
 [9]
 We have not overlooked that comment 5 to Section 2-607 also states that a beneficiary might properly be held to the use of good faith in notifying the seller that an injury has occurred once he becomes aware of the legal situation. We need not concern ourselves with the nature or scope under Iowa law of this obligation of good faith notification, because we hold only that the Iowa Supreme Court, under the totality of the circumstances in this action, would not apply the notice provision to McKnelly
 
 
 [10]
 Although we do not consider it necessary to the result reached above, we note also that in our view a submissible express warranty case arises out of evidence relating to Sperry's published representations as to cable capacities. In a 1970 catalog Sperry published the Model 23's calculated cable capacities, both in feet and in layers of cable, for certain cable widths. This publication also stated the winches were tested and rated according to SAE procedures. Another publication, Sperry's application engineering manual, contained further cable capacity figures and a formula for computing cable capacity for any size winch, including the Model 23 winch as modified here
 Simon Tamny, a mechanical engineering expert called by McKnelly, testified it could be reasonably assumed that a distributor would use or recommend the use of these published representations and that the implication of the catalog was that the figures complied with SAE standards. In Tamny's opinion, however, a person who relied on the published representations, either to equip the winch as sold or to compute the cable amount for the modified winch, would fill the winch with cable almost to the brim. This would be well beyond the 65 percent recommended by SAE in 1969-70, and would, in Tamny's opinion, increase the risk of the cable's slipping off the drum. Tamny testified that the amount of cable used with the winch at the time of the accident was roughly consistent with the published representations. And in his opinion, this over-filling of the winch was a major cause of the accident.
 Viewing the evidence most favorably to McKnelly, we think the jury could (1) regard the published representations as a warranty, in effect, that the winch was capable of adequately taking the amount of cable indicated; (2) infer that the purchaser relied on these representations in purchasing, modifying and supplying a cable for the winch; (3) find that, in fact, the winch could not safely hold the amount of cable "warranted"; and (4) find that the over-filling of the winch in accordance with the published representations was a substantial concurring cause of McKnelly's injuries. Accordingly, we think a submissible case was made out in this regard.