# IN THE COURT OF APPEALS OF IOWA

No. 17-0983
Filed November 7, 2018

**PATRICIA MOORE,**
        Plaintiff-Appellee,

**vs.**

**WINNESHIEK MEDICAL CENTER and MAYO CLINIC HEALTH SYSTEM-DECORAH CLINIC,**
        Defendants-Appellants.
_____

Appeal from the Iowa District Court for Winneshiek County, Richard D. Stochl, Judge.

Defendants appeal following a jury verdict in favor of the plaintiff on her medical malpractice claim. **AFFIRMED ON BOTH APPEALS.**

Timothy C. Boller of Weilein & Boller, PC, Cedar Falls, and Nancy J. Penner of Shuttleworth & Ingersoll, PLC, Cedar Rapids, for appellant Winneshiek Medical Center.

Gregory E. Karpenko of Fredrickson & Byron, PA, Minneapolis, Minnesota, and Kevin J. Visser and Christine L. Conover of Simmons Perrine Moyer Bergman, PLC, Cedar Rapids, for appellant Mayo Clinic Health System-Decorah Clinic.

Matt J. Reilly of Trial Lawyers for Justice, Decorah, for appellee.

Heard by Vogel, P.J., and Vaitheswaran and McDonald, JJ.

**VAITHESWARAN, Judge.**

A woman who underwent a CT scan at a local hospital had a severe allergic reaction to the contrast dye administered with the scan. She filed a medical malpractice action against the hospital for which the attending physician worked as well as the local hospital where she was treated. A jury awarded her damages. On appeal, the hospitals contend the woman failed to prove their conduct caused the injury. One of the hospitals also argues the woman did not establish a breach of the standard of care.

## I.    *Background Facts and Proceedings*

Patricia Moore had a heart attack in 2005. During follow-up care, she was administered an angiogram with contrast dye. Her blood pressure dropped, and she was informed she had an allergy to the dye. After learning of the allergy, Moore attached a sticker to the back of her driver's license stating "no contrast dye."

Six years later, Moore experienced chest pain at work. An ambulance was called and paramedics transported her to the emergency room of Winneshiek Medical Center in Decorah (Winneshiek). Moore said she told the paramedics about her allergies to penicillin and contrast dye.

On Moore's arrival at the hospital, a nurse asked her about allergies. Moore told her she was allergic to penicillin and contrast dye. Dr. Kent Svestka entered the room. He worked for Mayo Clinic Health System-Decorah Clinic (Mayo) and served as the medical director of the Winneshiek emergency department. According to Moore, she or someone else in the room told Dr. Svestka about the

allergies. Dr. Svestka examined Moore and ordered certain standard tests to gauge her chest pain.

Meanwhile, Dr. Svestka noticed that Moore appeared to be in severe pain. He suspected she might be experiencing a rare condition known as an aortic dissection. Dr. Svestka ordered a CT scan with contrast dye, the only test at Winneshiek that he believed could conclusively rule out the condition. He testified he was unaware of Moore's allergy to contrast dye.

The person who took Moore to the radiology department to undergo the CT scan asked Moore about allergies. Moore "told her penicillin and contrast dye." The person conveyed the allergy information to the CT technician. The technician, in turn, questioned Moore about her allergies. Moore repeated what she told the intake nurse—that she "was allergic to penicillin and contrast dye." The technician asked her what the issue was with the contrast dye. Moore told her that her "blood pressure dropped."

The technician placed Moore into the CT machine. When Moore came out, she screamed that something was wrong, then lost consciousness. Moore's heart stopped beating for at least five minutes. Moore awoke to her crying family and a priest "giving [her] the last [rites]." Later, physicians at Mayo Clinic told her she had been administered the contrast dye.

Moore sued Winneshiek and Mayo for medical malpractice. She alleged their employees "failed [to] use the degree of skill, care and learning ordinarily possessed and exercised by other medical providers." The district court instructed the jury Moore would have to prove the following:

1. The standard of care expected of a similarly situated physician under similar circumstances.

2. Dr. Svestka was negligent in his care of Ms. Moore in the following particular:

    a. On April 11, 2011, Dr. Svestka ordered a CT scan with the administration of contrast dye to Ms. Moore when he knew or should have known she was allergic to that medication.

3. That Dr. Svestka's negligence was a cause of damage to Ms. Moore; and

4. The amount of damage caused to Ms. Moore.

The jury was further instructed that the hospitals were "liable for the negligent acts of an employee if the acts are done in the scope of the employment." And the jury was instructed "to determine the standard of care," "failure to meet the standard of care, if any," and causation "only from the opinions of the medical providers who have testified as experts in this case." All parties called expert witnesses.

Winneshiek and Mayo moved for directed verdict at the close of Moore's case and the close of the evidence. The district court took the matter under advisement. The jury returned a verdict in favor of Moore and awarded damages of $400,000. The jury assigned Winneshiek 67% of the fault and Mayo Clinic 33%.

Winneshiek and Mayo moved for judgment notwithstanding the verdict. The district court denied the motions, reasoning as follows:

The court has reviewed all of the evidence in a light most favorable to the plaintiff. Plaintiff presented expert testimony on the issue of both breach and causation. That testimony along with the medical records indicating both Mayo and Winneshiek had prior knowledge of plaintiff's dye allergy but administered the substance to her anyway was sufficient to generate a jury question on both negligence and causation.

Winneshiek and Mayo appealed.

## II.     Error Preservation/Standard of Review

As a preliminary matter, Moore raises several error preservation concerns grounded in the claimed lack of specificity of the defense motions for directed verdict.  *See Pavone v. Kirke*, 801 N.W.2d 477, 493–94 (Iowa 2011) ("A motion for judgment notwithstanding the verdict must stand on grounds raised in the directed verdict motion.").  We find these concerns unpersuasive, and we proceed to the merits.

Our review of the district court's post-trial ruling is for correction of errors at law.  *Thornton v. Am. Interstate Ins. Co.*, 897 N.W.2d 445, 460 (Iowa 2017).  "In reviewing rulings on a motion for judgment notwithstanding the verdict, we simply ask whether a fact question was generated."  *Royal Indem. Co. v. Factory Mut. Ins. Co.*, 786 N.W.2d 839, 846 (Iowa 2010).

## III.     Causation

As noted at the outset, both hospitals contend Moore presented insufficient evidence to support the causation element.  The jury was instructed that "[t]he conduct of a party is a cause of damage when the damage would not have happened except for the conduct."

Moore presented two experts, both of whom opined on causation.  The first, Dr. Stephen Scheckel, was asked, "Doctor, you're not going to offer any opinions regarding the extent to which Miss Moore sustained any injury as a result of this incident; correct?"  He answered, "That is correct, other than I know that she did have a cardiopulmonary arrest."  Although the question was posed in the negative, Dr. Scheckel essentially opined that Moore experienced cardiopulmonary arrest as a result of the incident.  The testimony sufficed to withstand the motions for

judgment notwithstanding the verdict. *See Winter v. Honeggers' & Co.*, 215 N.W.2d 316, 323 (Iowa 1974) (Expert testimony indicating *probability* or *likelihood* of a causal connection is sufficient to generate a fact question on causation); *see also Hansen v. Cent. Iowa Hosp. Corp.*, 686 N.W.2d 476, 485 (Iowa 2004) ("Buzzwords like 'reasonable degree of medical certainty' are therefore not necessary to generate a jury question on causation.").

Moore also called Dr. Lester Zackler, who testified to her memory loss and problems with attention, concentration, and information processing. According to Dr. Zackler, testing revealed "permanent problems with brain functioning as a result of this allergic reaction." Dr. Zackler engaged in the following colloquy about causation:

> Q. And, Doctor, then can—I think to wrap it up, then can you state to a reasonable medical probability that the contrast dye she got on April 11th, 2011, is what caused this ischemic anoxic event? A. Yes.
> Q. And are your opinions to a reasonable medical probability that this ischemic anoxic event is, in fact, what has caused these problems that you described to the jury with her working memory, with her multitasking, with her sensitivity, and this loss of cognitive reserve? A. Yes.

The expert testimony alone generated a fact question.

Dr. Svestka's admissions bolstered the expert testimony. Dr. Svestka acknowledged treating Moore in the emergency room just two months earlier and making a notation of her history of contrast dye allergy. He also admitted treating her in 2007 and documenting a history of contrast dye allergy. When asked, "If you had remembered that, you would not have ordered the CT scan that you did?" Dr. Svestka responded, "Correct." Later, he reiterated, "So probably would have

been a different scenario" had he remembered what he knew previously. He acknowledged "some speculation about what would happen at that point in time."

Because Moore generated a fact question on causation, the district court did not err in denying the defense motions for judgment notwithstanding the verdict on this element.

## IV. *Breach of the Standard of Care*

Mayo Clinic argues Moore "failed to offer testimony establishing that Dr. Svestka breached the standard of care." The jury was instructed on the standard of care with respect to Dr. Svestka as follows: "A physician must use the degree of skill, care and learning ordinarily possessed and exercised by other physicians in similar circumstances. A violation of this duty is negligence."

Dr. Scheckel testified extensively on the standard of care and breach of the standard of care. He began by stating, "Based on the history of present illness, I don't think it was adequate to go ahead and order a CT with contrast at that point." He then engaged in the following exchange with counsel:

> Q. And it's his job to find that out either from the nurses, the patient, the records, whatever sources are available to him, but he has to make an effort to find it from someplace whether or not she has the history; correct? A. Yes.
> Q. And his failure to do so was a breach of the standard of care for an emergency-room physician? A. Yes, to not elicit potential allergy if you're ordering a substance that could cause an allergic reaction, yes.

Dr. Scheckel was also asked, "If the doctor is going to give [contrast dye], is it within the standard of care for him to do so without first getting that history?" Dr. Scheckel answered, "No." He was asked,

> Doctor, regardless of the source, whether it's medical records or taking the time to go talk to a nurse or taking the time to ask the

patient all the questions, does the standard of care require Dr. Svestka, before ordering that CT with contrast, to ascertain from some source whether or not this patient has had a prior contrast dye allergy?

He responded, "Yes." He continued, "If there is a reported allergy from any area, from any source, I believe the physician has to make that decision." When asked to confirm his deposition testimony about the existence of a system to inform the physician of a contrast dye allergy, Dr. Scheckel responded,

> Yes, but I explained it further, that it also includes the physician asking about the allergy and it also includes records including the record of that visit which on the top of it we almost always—it's on the front page, but it's almost always at the top, allergies, and what I'm referring to is a safety net. That's the system.

He elaborated, "I said repeatedly [Dr. Svestka] needed to make himself aware of any allergies, however that happens, asking or reading the records." In his words:

> A safety net is redundancy, and it's built in a lot of complicated systems, and it means that multiple people double check, just as when we order a medication, we should check for allergies before we order it. The nurse—the pharmacist checks for allergy before they dispense it, and a nurse once again checks for allergies before they give the medication. And so that's the safety net, even though, ultimately, we're responsible for the medication we order, we have a safety net built in to try to prevent missing something along the way.

He clarified "we" meant "the physician that orders the medication." Dr. Scheckel summed up as follows:

> Q. And if that's true, if Dr. Svestka did not find out from the records or the nurses or the EMS or the patient or prior medical records, found out from no place, is that within the standard of care?
> A. No, because he's ultimately responsible for the order he wrote.

Moore generated a fact question on whether Dr. Svestka breached the standard of care.  Accordingly, the district court did not err in denying the defense motion for judgment notwithstanding the verdict on this element.

**AFFIRMED ON BOTH APPEALS.**